Thank you very much. Thank you. Thank you for asking that question. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Ms. Godwin, when you're ready. Thank you, Your Honor. May it please the court, my name is Hillary Godwin, Assistant Federal Public Defender with the Northern District of West Virginia. And I represent Appellant Austin Lodge. We're asking the court today to review this case because of the unique facts. We wouldn't be here if they weren't unique. We have not found a case similar in which a defendant claims an item, has that item on a place he is permitted to be, stashes that item, and is still found to abandon it. The tests set out from Small, Farabee, Frazier, all indicate very distinguishing factors from this case, which is why we believe, while respectfully, that the district court in this case made a mistake. The test here is what facts support the appellant's privacy interests? What shows his intent? The magistrate judge found seven factors that went into play here. Those are found on page 152 of the joint appendix. Of those seven factors, two he did not find persuasive. Those were Mr. Lodge's statements at the suppression hearing that he did not know who was pursuing him, he did not know he was being pursued by law enforcement, and that he intended to return for the package. The district court heard that evidence and set it aside as uncredible. Accepting that fact, as decided by the district court, or by the magistrate judge and accepted by the district court, there are still five factors that the court found that, in our opinion, clearly demonstrate Austin Lodge's attempt to preserve his interest in this item. When asked about it, he did not dispute he had a bag. When asked what was in it, he said nothing bad. Was that true? No. But he still recognized the statement by law enforcement. He acknowledged he had a bag, and he did not dispute that. How does that play into abandonment? The fact that he acknowledged that he, and I think everybody agrees that his statement that nothing bad is in the bag was taken as him acknowledging some ownership in the bag. How does that play into abandonment? Your Honor, we have not found a case in this country where someone has claimed the bag and then a court has agreed that it's abandoned. This would be the first case that we have found where, with that fact . . . Now, there's plenty of cases that say when the defendant denies it's his bag, he has abandoned his right. That's well settled at this point in multiple circuits. Well, we go by the . . . What was the objective evidence that the police officer observed? So in this case, Mr. Lodge is driving at 100 miles an hour in a 25 mile per hour zone. He gets out of the car when he stops, he goes to a trailer, he tries to get in, but he can't, which might, to an objective officer, indicate an attempt at breaking and entering, and then he flees. He flees with the bag. When they capture him, he doesn't have the bag. Now, he did say it was his at some point, but where the bag was abandoned, I've looked at the pictures, it's just kind of a junk heap. I mean, objectively, that would seem to indicate some serious question as to whether or not he intended to keep dominion and control over the bag. Thank you, Judge. I think for clarification in this point, true, the officers, from their perspective, have someone fleeing, have someone attempt to enter a residence and are unsuccessful, and then flee around the back of that residence. But before they find the bag, before they even find the bag, they have captured Mr. Lodge, identified him, identified his ties to the property, have identified that he is claiming the bag, and . . . Well, they've identified he claimed he had some right to be there, but that's contradicted by the inability to get in when the door slams on him. And we have evidence, again, this is after the fact, this isn't what the officers have in the moment, but after the fact, we learned why that was closed. I believe Ms. Baker testified during the suppression hearing. Right, but if they didn't know it when they were looking for the bag, what difference does it make? They've been put on notice that at least, to Mr. Lodge's perspective, he has a reason to be there. He's attached a familiar connection to this property, and to disregard that . . . But do the objective facts lead to that, based on what the officers say they saw when he was trying to enter the trailer? I believe they do. Again, here we're looking at Mr. Lodge's intent, and it's not . . . The officer testified that he saw him try to place the bag in the door, regardless of whether he could get in or not. He was still trying to place the bag in the residence, and that shows an attempt to preserve that item, to keep it. Again, officers testified that they . . . Well, it shows an intent to put the bag in the trailer, right? Absolutely. But what objective about those actions show that he has a reasonable expectation of privacy in that home, or on that property? If he did not have an expectation of privacy, then perhaps there would be abandonment there, which would be questionable. But if someone's intending to abandon an item while being pursued by law enforcement, he had multiple opportunities to do so before he was at this residence. Again, he was not stopped here. This was his destination. He pulled in, parked, and got out before law enforcement came there. So he intends to be here. How are they supposed to know that? They see this guy, he runs up to the door, tries to get in, he's not admitted. It doesn't seem unreasonable for a police officer to think, this guy's trying to break into this trailer, and he's now been repulsed, and he's taken off and going. Absolutely, Judge. But what we have in the interim, after they see him place the bag, or they don't see him place the bag, but after he's placed the bag, they get him. And they speak with him. And he tells them what he's thinking. He tells them why he's there. He tells them it's his bag. All before they find it. In fact, he narrows their search for them. He says, I placed it roughly here. And they find it roughly where he says he placed it. And this is a place, again, I don't know how clear it is from the record, but you have a small front yard, a residence. This bag is placed with other personal property behind the residence, between the residence and a shed. Along one side is running a fence. This is curtilage of the home. It's not on the roadway. It's not off to the side. So your argument is that he didn't abandon the bag? Absolutely not, Judge. So what did he do then? He was attempting to preserve his Fourth Amendment privacy interest. He did not want to be caught with it. We don't dispute that. But we don't accept the district court's finding that it has to be one or the other. We dispute the argument. Are you saying he was trying to conceal the bag? Conceal or just keep without having it on him. So conceal or keep? Yes. He wanted to keep his interest. I'm asking you. Conceal or keep? He was trying to conceal it. But once caught... And what's the difference legally? Legally, it shows intent. It shows a clear intent to preserve your Fourth Amendment privacy interest. Well, concealment doesn't equate to abandonment, does it? No. I can conceal stuff in my home. I take it from the living room to a bedroom upstairs. Because I don't want the police officers to see it, but it's still my property. I haven't abandoned it. I'm concealing it. To expand on your analogy here, Judge Gregory, you can conceal stuff in your car, and where it's enclosed in your glove box, they need a warrant to look in your glove box. Here we're saying it's pretty much the same thing. This is curtilage of a home where someone has permission to be. The court's found that he had permission to be there. The court's found that he claimed the bag. With facts set out quite like this, we have not seen an analogous case where it equals abandonment. And our position, Your Honor, is that with all respect to the district court, they were, in my view, it appears they were trying to conflate two issues. They were trying to- So you say he had permission to be there. Yes. How do we glean that, that he had permission to be there? Officers, when speaking to Lodge, discovered that it was family property. Essentially, the maternal grandparents of his, or maternal grandmother of his children lived there. He tells them he had lived there before, he has lived there intermittently, he lives there off and on, he has permission to be there. All before they got the bag. All before they got the bag. All before they got the bag. Absolutely, Your Honor. Right. You can't stop the objective of, oh, he tried to get into the door, that's the end of it. No, you were informed before you got the bag. Right, you talked to the lady. Exactly. And they didn't call the police officer who talked to her, did they? They did not. Interesting. They did not. Yeah. Your Honor, that's our position. Again- So what I'm getting to is that, what I was getting to with my question was, how do you balance or weigh the fact that if he has this permission to be there, yet the testimony is he's turned away at the door. How do we, how does the panel balance that? I think you can look at the totality of the circumstances. Again, this isn't in a vacuum. This is, if it had been a situation where law enforcement cut him off and forced him to stop here, then maybe that's a heightened question of whether or not he intended to be there, or he has permission to be there. If he couldn't tell you who lived there, or his tie is there, or only the first name of someone who lived there, that would also be weighing into the factors. I think in the totality of the circumstances presented in this case, Judge Young, that there is sufficient evidence to at least put the officers on notice, that at least in his opinion, he thinks he can be here. And the question for a reasonable officer is, what is this person's perspective of their privacy interest? That's what Fair Abuse stands for. And whose burden is it to prove, to establish abandonment? It's a De Novo review, Your Honor. The fact supporting whether or not it's abandonment is clear error, but the ... It's the government, isn't it? It is. Yeah, it's the government's burden to prove abandonment. Absolutely, Judge. Your Honor, I have about four minutes left. In that time, I would like to address any other questions you may have. Thank you, Counselor. Thank you. Thank you, Counselor. Thank you. Ms. Wesley? May it please the Court. My name is Zelda Wesley. I'm the Assistant United States Attorney from the Northern District of West Virginia, and I'm here for the government. So let's start with whether or not the officers knew that he had a right to be there, because the analysis is an objective one. The record will make it very clear that they had no information that this is a place that he could have been. Let's start with the fact ... Well, didn't he say that he slept there and that his kids slept there? And during the suppression hearing, he provided a lot of this information, which of course is subsequent to the seizure. Did he say any of that at the scene? At the scene. The only thing he said was, when someone asked him, do you know these people? And what he said was, the grandmother of my daughter lives here. That was all he said. Now, the circumstances of people in the residence who were not letting him in, he did not have a key, no one opened the door for him, no one let him in, certainly suggests that he is at least on this day not welcome into that residence. Did they talk to the resident before they found the bag? I'm pretty certain they did. In the joint appendix, in page 106, the person in the residence said, we don't know him. Oh no, wait a minute, wait a minute. You asked those questions and the answer was, she said, why in the world would I say that? That's not true. That's what she said at the suppression hearing, Your Honor. That is later. And on the videotape, it's really clear that one of the officers said that they spoke to her and she says, and it's contained in the joint appendix on page 106, that I do not, we don't know what's going on and I don't know this person. Now, if you want to talk about the suppression hearing, we can talk about her credibility because the videotape makes it really clear that she spoke to the officers, but at the suppression hearing, she lied. Did you put the officer on that talked to her? We played the videotape. Did you put the officer on that talked to her? We put an officer, Flanagan, who's the one who found the bag and who did the chase. There's the videotape of it where... But you're making a big thing now that, oh, she couldn't get in there to know who she was. Did you put the officers who talked to her on it? We played his video camera. Yes and no can work here. I really do believe that. Yes. Let's try it. Let's try it. Yes, sir. No, we did not put the officer on, but we did... But you asked questions trying to get her to say, well, didn't you tell the police officer you were making these statements and she denied them? I mean, it's the perfect time if you had an officer to say otherwise and put them on. We played his video recording, which was his statement. We played his... In any event, that is what is contrary to the objective, what happened here. It is an objective analysis and objectively, there isn't anything to suggest to these officers or any reasonable person that this man who didn't have a key, who wasn't permitted entrance into the house, who was trying to push this backpack with 300 grams of meth into the residence, there's nothing to suggest that he had the right to be there or that he was welcomed in. There's nothing to... Wait a minute, counsel. Wait a minute. There's nothing to suggest that he was... Are you really... That's your argument? There's nothing to suggest that?  How do we not know? Just because he says, the grandmother of my daughter lives there, maybe it's a domestic situation, maybe he's not welcomed there. No one knows that. That one statement about a family relationship does not decide whether or not he's welcome into that residence. And certainly, the evidence suggested he wasn't. I'm gonna try it again. You're saying... I'm not talking about dialogue. I'm talking about the fact that you said he was trying to put a bag in that. That doesn't even suggest at all, nothing, that he had a relationship to that place. What it suggests is that he was trying to abandon the bag. That's all it suggests, Your Honor. So you go to a house that you don't know who lives there, I'm gonna abandon it by knocking on this door and say, put this bag here, because the police are right behind me. That's what you're arguing? What the officers knew objectively, yes. If he had been successful, if he had... Let's just say, for example, that he just wanted to leave the bag on the door, thinking the officer may not have seen him, and then he fled someplace else. Then his attempt of getting rid of the bag would have been successful, but the officer was close enough to observe it. But what we're doing is talking about his subjective goals and his intent, and that's not the analysis, Your Honor. It's... Once the bag is seized, and once the search is conducted, then going back... Once the bag is seized... After it's recovered, Your Honor. When you talked to the lady, the lady said that she told him that he lived there. That's during the suppression hearing. That never came out during the time when the scene. That came later. That was... That's what... No, but she testified. That's what she said. During the suppression hearing in the court, she... And she was under oath, and you put nobody on to counter that. Well, under oath, she... It was no burden. Under oath, she also said that she did not speak to the officers that day. Joint Appendix 106. She said, under oath, that she did not speak to the officers that day, which is clearly a lie. So she can't have it both ways. The lady said it was 3 o'clock in the morning. I'm discombobulated. I see cars out there. I hear people... Somebody yelling, help me, help me, help me. Right? That was, you know, the fellow. And then, that's what she said. Then when she said, yeah, she did talk to people. She did talk to... She said, what you were trying to get her to say is things that you're trying to put words in her mouth and say it. But didn't you say you didn't even know this person? And she said, I guess I didn't see her, but she must have been grimacing because she said, why would I say that? I was like, duh. I mean, I've told you, he lives there from time to time. And as to play, he has a run of the place. She testified under oath. And you put nobody on. And yet, you said, you told... You're telling us... The thing about it is that I think we can't relieve ourselves of common sense here. I'm going to follow what you're saying, what other people said. You said he was going 100 miles an hour. In excess. Interesting. 100 miles an hour. That's pretty fast. He must go around a lot of curves and places. If you wanted to throw the bag out, you had plenty of chances to throw the bag. So, you would opt to... Here's the logic of what you're saying. 100 miles an hour, whoo, to the wind. You could do that. But instead, you decided to come back to this place and try to find a place that you have no connection with. I know what I'm doing. I'm going to go to a place where I don't know who lives there at all and knock on the door and try to get my bag in their door rather than throwing away what I'm doing 100 miles an hour with the bag. That doesn't make any sense. I mean, that's just common sense. It's not even law anymore now. That's not even common sense. So, Your Honor, what... Do you think that's common sense? Yes, I do. Because it didn't plan out the way that he expected. The officer kept pace with him. When he got to the residence on Moonlight Road, it did not unfold as he anticipated. It probably was his intention. He stopped at this place on his own, went there. That's what he did. Matter of fact, it did play out what he wanted to do. He wanted to get to a place where he had some right to protect it, where he lived. He was not living there at the time. I believe that was a part of her testimony. He was not living there at the time. That was not home. What he could have done is he could have left the backpack in the vehicle. It is a backpack with straps. He could have kept it on his back. He could have even left it on the porch, but that's not what he did. The only intent he had was to divest himself of that backpack. I want to ask you about that. The fact that you say he wants to abandon, your position is he abandoned that, correct? Yes. What about the fact that he makes statements that has an addition of ownership? Thank you for bringing that up. How do you deal with that vis-à-vis abandonment? If you look at the video recording, they knew that he had the backpack before that. They, meaning the police? The police officers, before that conversation ever took place. The witness that we called for the hearing is Deputy Flanagan, and Deputy Flanagan was admitted. Before Deputy Flanagan got to this area, there were two officers who were already looking for the backpack based upon Deputy Flanagan saying that there was a backpack there. They did not have the specificity of the backpack, which is why they knocked on the residence to talk to the homeowners. Deputy Flanagan shows up, and this is before there's any conversation with the defendant. When Deputy Flanagan shows up, he says it's a Camel backpack. He tried to push it in the house, and he ran behind the trailer and put it. They already knew that he had the backpack. The ownership and his possession of that backpack is of no consequence, which is the reason why. And after Deputy Flanagan says this, then what he does is he goes behind where he saw he ran to look for and retrieve the backpack. And while he's gone, there's a conversation between Mr. Lodge and one of the other officers, and the officer said to him, what was in your bag? We're about to get it. And that's when Mr. Lodge says, nothing bad. That statement from him is not any attempt to say I didn't abandon it. It was a statement because they were still looking for the backpack. It was merely said to try to curtail the search because he didn't want them to continue looking for it. But could you objectively look at that as ownership? Yes, it's ownership that he abandoned. It was his backpack, but he's not saying give me back my backpack. What he is saying is don't look for that backpack because there's nothing in it. And that is an easy distinction to make. A variation on the question I ask your opposing counsel is what about concealment? Why isn't it that he tried to conceal the bag and get back to it? I'm sorry. So, first of all, you conceal things in your home, in the privacy of your home. You conceal things in your car. This is in the- Drug dealers conceal drugs in bushes? Well, there's no expectation- I think the answer is yes. That's my prior experience. Yeah, so it is. In public, right. But there's no expectation of privacy once you do that. Once you've done that, you have relinquished any Fourth Amendment protection because it's voluntary- I don't think somebody over at St. Paul's in Chamberlain would say that if you went in and took their stash. I don't think they'd say I've abandoned it. They might come after you with a non-millimeter. Well, so there are consequences for your abandonment in someone else taking it, but it is abandoned. It was voluntary. No one made him do this. Once he left it there, he had no right to expect that it would still be there. Going back to the- Since the property that Clinton had, he had no expectation that he would be able to get. He had full run of the place. This is a place that they talk about. Electricity is there. They have a television there. He's socializing there. The whole run of the place. His clothes are there. Shower's there. All those things. In terms of it's not just the home. For example, don't you think people put things in their yard? Outdoors? You think they abandon it when they put it outdoors? I have a lawnmower. I say, you know, I'm finished for the day. I'm going to leave my lawnmower out here in the backyard. So I've abandoned my lawnmower? He could have- Stick to my counterfactual here. Have I abandoned it? Yes or no? So you're not, obviously not your lawnmower, which is where it should be, probably back there by the shed. He could have left it on the porch.  What about did I put my cell phone in my backyard? Have I abandoned it? Let's say something. You said the lawnmower is supposed to be in the shed. What about my cell phone? If I put it in my backyard and say, you know, I left it up here in the backyard on the stone here, have I abandoned it? So, Your Honor, you're talking about things that don't necessarily have a criminal connection to it. A criminal connection? The Fourth Amendment says that. The Fourth Amendment doesn't- Wait a minute. Wait a minute. Are you saying that things that have criminal connection, I lose my right in terms of Fourth Amendment? That's why we have all these cases. I'm not saying- That's why we have searches. And people normally don't get prosecuted when there's nothing but candy in there or something like that. They get prosecuted because it's contraband. But we don't say, well, you know, it's contraband there, so it doesn't matter. The Fourth Amendment doesn't apply. It does apply. The question is whether or not you have an expectation of, put it somewhere that I have protection. And that's a circle of protection there, isn't it? That doesn't go away here. Well, it doesn't. But if we're going to talk about his subjective interpretation and his subjective analysis of what he expected, then- That's what it is. Well, then when you are fleeing in excess of 100 miles per hour from law enforcement and you have more than 300 grams of methamphetamine in your backpack, when you put it not in your car, not on the porch, not in this residence, but behind a residence, and, oh, by the way, you run in the opposite direction, then that's abandonment. But the officers who have an objective perspective on what is reasonable, they know those facts. And what they also know is that he was denied entry into that residence. There was no reason for anyone to think that he would have been a He had no key, no one letting in, he's pushing on the door. They didn't see a person come through the door, did they? They said it looked like the door opened. They couldn't even identify that a person actually came through the door. But what they could identify was him pushing the backpack towards the door, and that part is very clear. But there's no evidence that they saw a person actually reject his entry at all. That's a misstatement of the record. Well, no, that is a part in the record. But they didn't. They didn't say they saw a person at all. All they could see was that it was a push, and he was trying to push it there, but they didn't say that. They couldn't tell whether or not. Well, that is a part of the record as well, Your Honor. One of the things that the district court did, the district court found it compelling that there was the first attempt to get rid of the backpack by trying to leave it on the residence. And the fact that it was placed someplace else is compelling. And those conclusions and facts by the district court are not clearly erroneous. What's compelling about that in terms of abandonment? What is compelling? You know, I come to my front door. I thought I had my key. I don't have my key, but I put my bag down, so I go to the back door, and I leave it there. What's compelling is the fact that I went to another door, or another place on property that's private property. And if I may add to that question, is it compelling as to abandonment, or is it compelling as to concealment? It's – so I'm not certain that I understand what you're asking me, sir. Seriously, I'm not certain what the question was. But in terms – and I'm happy to answer if you rephrase it, and I'm sorry about that. But in terms of concealment and abandonment, concealment under these circumstances just don't exist. It is abandonment. And when you look at the objective information that is available to the officers, there's no reason for anyone to think or reasonably conclude that the only intent, based upon the available evidence, was that he was divesting himself of 300 grams of methamphetamine. That whole night, 1, 2 in the morning, was his attempt to separate himself from that bag. In terms of just a logical sort of sense that concealment and abandonment are not mutually exclusive, right? So actually, no. I think under some circumstances you can conceal something, not in the facts of these circumstances. If you're going to conceal it, leave it in your car. If you're going to conceal it – He couldn't because he didn't have a car. He was on foot. No, he was in the car. He abandoned his car. He took the backpack out of the car to put it someplace else. That chase started in his vehicle, and he reached in and grabbed the backpack from the car to divest himself of it. He could have left it in the car. That means that concealment purposes, that was not a good choice because he had already been going 100 miles an hour. It's reckless driving. So therefore, whatever may do that. So concealment wasn't a good choice, but that doesn't mean it's automatically now. The next step is abandonment. It's another place to conceal, and the place is a place where I live. In the Fourth Amendment, that's the whole idea. Our founders were brilliant in that sense. They knew you needed protection from the government. No, you can't make me testify against myself. No, you can't come to my house without – Those are beautiful. One of the few nations in the world we have that. So to divest yourself of that under these circumstances, you simply mean that once you want to conceal something, if it's on your property, go for it because you're trying to conceal it. Yes, I'm trying to conceal it, but I'm concealing the place where I still am wrapped with some protection. And it's your burden to say he's done more than conceal, but he's actually abandoned. The district court found – Can you cite a case that will come close to what you're trying to get us to do today? In the Fourth Circuit? They'll be happy because that's the one that normally binds us, or the Supreme Court will help. Your Honor, so one of the – yes, he's – Go ahead. Give it to me. Okay. I'm sorry. No, no, no. So one of the cases – No, no, no. What? Give me the case. I really like the Ferebee case in the Fourth Circuit. Well, give me the facts of that to make that yours. So under that case, he voluntarily distanced himself from the property, and that's exactly what this defendant did. What did he do? Go ahead. Give us the facts. I know Ferebee. I want you to tell me how you get that to your case. Go ahead. Well, he does. The second that he divested himself of it voluntarily – No, I'm talking about Ferebee now. Tell me how the facts of that case will be controlling and yours. Please, because I know Ferebee. Go ahead. Well, and maybe – I know Ferebee, too, but unfortunately right now I didn't write down the facts of it. I'm looking – Okay. I won't rob you then if you don't know that. Go ahead. I'm sorry. And I'm sorry. I know I'm over my time, but I do want to say one other thing. Sure. And that is what the district court found, and that's the fact that he was not credible. And that it's a self-serving statement for him to later say that he intended to reclaim it. And any type of – if you have to reclaim it, that means you've abandoned it. The whole essence of concealment and then going back for it later is reclaiming it. And if you've got to reclaim it, that means you left it, you've abandoned it, and you no longer have an expectation of privacy. Thank you. Thank you. Thank you. Thank you, Your Honors. So, Ms. Godwin, you rely on most to say – the most case to say that this is concealment. Well, how do you get there with most? Because isn't most the case where the young man had the bag that the young lady at the grocery store was guarding? Is that correct? Yes, Your Honor. Our position is that most stands for a principle that you can relinquish an item temporarily and still retain a privacy interest in it. In most, it was a situation where that was – That was almost a bailment. I'm sorry, Your Honor? That was effectively a bailment. To a degree, yes. It was a situation where he was not being pursued by law enforcement. He was going into the store to shop, I believe, and he gave the bag to the staff, as everyone who came into the store was required to do. So it wasn't like a special exception or anything in that case. It was something – So how does a bailment have – how does that relate to abandonment? Our position would be it's almost of a degree. Abandoning something is in a location where you can't expect that it's guaranteed to be there when you come back. With a bailment or concealment or some kind of retention of privacy interest, you're placing something in a place that, in other words, you expect with a reasonable degree of certainty that you can come back and get that item. I guess the point is it's somewhat inopposite for most, but the point is you're not relying on bailment for it at all, are you? No, Your Honor. Right. A few facts that – or a few points that my colleague made that I wanted to address is, in our opinion, it appears she is asking this court to find facts different than what the district court found. The district court found a number of facts. Now, they concluded that it equaled abandonment, which is what we're arguing is the issue, but the government is trying to argue that he had no privacy interest, he had no permission to be there, when, in fact, the court found, by its review of the evidence, that he did, in fact, have permission to be there. The government is arguing that he didn't really claim the backpack. It was inevitable. In Farabee, he's holding the backpack. He's holding it. And officers are right there, and he's still denying it. So the prospect of the United States is, well, he had no choice but to claim it. It's just not how it typically works. We often see clients with evidence clearly tied to them immediately disclaiming a connection. And in hindsight, you want to shake them. It's like, why? They're going to blame you anyway. Try to preserve what you have. And here, it was very unique in that Lodge did that. I also want to address what the United States indicated as far as Ms. Baker's statements, both the night of the incident and at the suppression hearing. As Judge Gregory, you pointed out, this was 3 a.m. There's no evidence to suggest that prior to officers knocking on her door, she had any reason to know who had tried to get in or who was yelling in her backyard. All she knew, it was 3 a.m., she had heard the door, and by the time she got there, everything was in the back. She didn't know what was going on. At the suppression hearing, she clarified, yeah, he's more than welcome to be there, and had an officer knocked on her door and asked her any questions, she probably would have said, hey, we have Austin Lodge in the car. Who is he to you? As she indicated at the suppression hearing, he's practically my son. So I think that's a factor that this court can consider, but I think that the district judge already found those facts, and I think that you can rely on those to determine whether or not the facts that the court found may equal a different conclusion than what the district court reached. I believe, and it may not be very clear on the record, but I do believe it's addressed either during the suppression hearing or in the officer's report that when Mr. Lodge attempted to gain access to the home and was stopped, the officer was very clear and he didn't see anyone, and it could have been a chain lock, which in fact was the case here. The door opened just enough for a chain, not something you could unlock with a key, so even if he did have a key to the residence under this particular circumstance with a chain lock, he couldn't have gotten in anyway. I'd like to ask you, can you cite a Fourth Circuit case that comes to the conclusion where an individual is running from the police and discards some property where it's been found to be anything other than abandonment? No, Your Honor, but I can distinguish in that in every Fourth Circuit case I've seen, they haven't ended up on their property, and they have not also claimed the property before it was located by law enforcement. Those cases don't come to us, right? Not typically, Your Honor. Here, that's normal, the jettison, trash cans in the woods. This case would be totally different, I suppose, if he had in the woods. I would be in a much weaker position, Your Honor, much weaker position. Thank you, Your Honors. Counsel, I note that you're not court-appointed, but you are court-assigned. I know you're a federal public defender. I want you to know that the court appreciates your taking this on. It means a lot to our court to have them always do that. We appreciate it very much. Also, we know, of course, Ms. Wesley's able representation of the United States. We'll come to our brief counsel and proceed to our next case. Thank you. We're going to take a brief recess. Thank you.
judges: Roger L. Gregory, G. Steven Agee, Roderick Charles Young